NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: April 18, 2023

S23A0141.  HARRIS v. THE STATE.

MCMILLIAN, Justice.

In October 2019, a jury found Evins Vontravis Harris guilty of felony murder and other crimes in connection with the shooting death of Darius Roberts.[1] On appeal, Harris asserts that the trial

---

[1] Darius was killed on or about May 7, 2018. On June 7, 2018, a Camden County grand jury indicted Harris for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), voluntary manslaughter (Count 4), tampering with evidence (Count 5), and two counts of possession of a firearm during the commission of a felony (Counts 6 and 7). At a trial in October 2019, a jury acquitted Harris of malice murder and voluntary manslaughter but found him guilty of the remaining counts. On November 26, 2019, the trial court sentenced Harris to serve life in prison with the possibility of parole on Count 2, five years consecutive on Count 6, and twelve months on Count 5 to be served concurrently with Count 6. The remaining counts were merged for sentencing purposes. Harris timely filed a motion for new trial, which was amended through new counsel on May 7, 2021. Following a hearing, the trial court denied the motion on June 16, 2022. On August 15, 2022, Harris filed a motion to set aside the order denying his motion for new trial because his counsel had not received the order until after the time for filing a notice of appeal had passed. The trial court granted the motion to set aside and reissued the order denying Harris's motion for new trial on August 24, 2022. Harris then timely appealed, and the case was docketed to the term of this Court beginning in December 2022.

court erred in denying him immunity from prosecution and abused its discretion by admitting an in-life photograph of Darius at trial. For the reasons that follow, we discern no reversible error and affirm.

The evidence presented at trial showed that Harris lived with his girlfriend, Daysha Roberts, and their infant son in a two-bedroom home in Camden County. Daysha's brother, Darius, also lived with them, although he did not pay rent. On May 6, 2018, Harris and Daysha were in the process of moving out because they were both unemployed and could no longer afford the rent.[2] Late that evening, Harris said he wanted to go to his mother's house and was going to call a cab. He then threw his phone on the bed and left. At that time, Darius was lying on the couch by the front door, listening to music on Daysha's phone with over-the-ear headphones.[3]

---

[2] Daysha testified that Harris had actually begun staying most nights with his mother after he and Daysha had an argument in April.

[3] In the week before his death, Darius often slept on the couch because someone had recently burglarized the apartment and he wanted to be able to

Harris returned home approximately 30 minutes later and entered the bedroom he shared with Daysha and their child. He told her the cab never came and asked for his cell phone. Daysha pointed to the phone, and Harris grabbed it and left the room. About ten seconds after Harris left the room, Daysha heard three gunshots. She placed her child in the closet, approached the bedroom doorway, and heard two more shots. When Daysha opened the bedroom door, she heard the front door forcefully open, followed by the sound of someone running outside. Daysha then saw Darius lying on the floor and ran outside to knock on the neighbor's door to ask for help. The neighbor called 911 and, at the direction of the 911 dispatcher, told Daysha to go back inside and see if Darius was still breathing. Daysha found her brother face-down and unresponsive. As she rolled him over, she took her cell phone from his hand and threw it on the couch.

---

protect himself and Daysha in case of another intruder. Harris later admitted to Daysha that he was the one who had broken into their apartment and taken the items – which included televisions, clothing, and Darius's gun – but he did not give her a reason why.

Officer Samantha Swartz of the Kingsland Police Department was dispatched to the scene. When she arrived, she saw the victim lying on the floor in front of the couch, face down, with his head positioned toward the front door. After determining that he was not breathing, she began chest compressions but was unable to revive him. She did not see a weapon near Darius's body. A recording from Officer Swartz's body camera was played for the jury.

The GBI was called to assist in the investigation, and Special Agent Jamie Karnes located seven spent shell casings from a .380-caliber firearm throughout the living room. Based on bullet defects found on the couch, cushions, and carpet, Agent Karnes determined that the shots appeared to have been fired from a downward angle. While searching the couch for additional shell casings, Agent Karnes found a 9mm Smith & Wesson handgun hidden underneath a sofa cushion containing 13 unfired 9mm cartridge casings. No rounds were found in the chamber of the Smith & Wesson, meaning that the gun was not in a position where a pull of the trigger would discharge the weapon. No 9mm spent shell casings were found at

4

the scene.

When Harris arrived at the hospital where first responders brought Darius's body, he ran over and said, "Daysha, I'm sorry." Law enforcement officers then took Harris into custody. After being advised of his rights under *Miranda*,[4] Harris agreed to be interviewed and eventually told detectives that he shot Darius in self-defense. At various points in the interview, Harris claimed that Darius had been raping him, his one-year-old child, his younger brother and sister, and Daysha.[5] Harris also claimed that Darius had pulled a gun on him several times in the past. A recording of the interview was played for the jury at trial.

Daysha testified that shortly before the shooting, Harris had become paranoid and accused her multiple times of cheating on him.

---

[4] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[5] Based on these allegations, officers arranged for an examination of Harris with a sexual assault nurse who found no evidence of acute or traumatic injury. Harris explained to the nurse that he would wake up and suspect that he had been sexually assaulted but that he was usually under the influence of drugs when this happened and could not remember the details. He also reported that Darius may have been "spiking his weed." Daysha denied that her brother had been raping her or her son.

After one argument, she went inside their home and locked the door, but Harris kicked the door in, damaging the doorframe. She told Harris's mother about his concerning behavior, and his mother tried to get him help, but he refused. Daysha had never seen Darius pull a gun on Harris.

The medical examiner testified that Darius sustained seven gunshot wounds, including one on the top of his head and two in his back. A GBI firearms examiner testified that each of the bullets recovered from Darius's body during the autopsy were fired from the same .380-caliber semi-automatic pistol. Although the firearm used in the shooting was never recovered,[6] Daysha testified that she had seen Harris with a gun that his friend had sold to him prior to the shooting.

1. Harris first contends that the trial court erred in denying his pre-trial motion for immunity from prosecution under OCGA § 16-

---

[6] Harris led officers to several different areas where he claimed that he threw the gun, but they were unable to locate it.

3-24.2[7] on the basis that he was reasonably defending himself against Darius and was justified in his use of force. We disagree.

To avoid trial on this ground, a defendant bears the burden of proof to show that he is entitled to immunity by a preponderance of the evidence. See *Hughes v. State,* 312 Ga. 149, 156 (4) (861 SE2d 94) (2021). In reviewing a trial court's ruling on a motion for immunity from prosecution, "the evidence is viewed in the light most favorable to the trial court's ruling, and the trial court's findings of

---

[7] OCGA § 16-3-24.2 provides:

A person who uses threats or force in accordance with Code Section 16-3-21, 16-3-23, 16-3-23.1, or 16-3-24 shall be immune from criminal prosecution therefor unless in the use of deadly force, such person utilizes a weapon the carrying or possession of which is unlawful by such person under Part 2 or Article 4 of Chapter 11 of this title.

Relevant to Harris's motion here, OCGA § 16-3-21 (a) provides:

A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

7

fact and credibility determinations are accepted if there is any evidence to support them." Id.

Here, Harris testified at the immunity hearing that he had asked Darius for rent money because he and Daysha were having money problems, but Darius refused. Harris also testified that Darius "started putting a firearm on [him] . . . in [his] own home" three or four times prior to the shooting. This prompted Harris to buy a gun, which he loaded on the night of the shooting "just in case anything happened before [he] got ready to leave the house." Then, as he exited his bedroom, Harris testified, he heard what he believed to be the sound of a round being chambered and turned to see Darius pointing a gun at him while Darius was still lying on the couch. Believing that Darius was going to shoot him, Harris shot at Darius as he ran from the home.

Daysha testified at the immunity hearing that Harris had never told her about any such alleged incidents with Darius and that Harris had been acting strangely prior to the shooting. The interviewing detectives testified that Harris gave conflicting

8

statements regarding the shooting and brought officers to various locations where he supposedly disposed of the gun, but they were never able to recover the weapon. A recording of Harris's interview was played at the hearing. Special Agent Karnes also testified as to the forensic evidence found at the scene.

In denying the motion for immunity, the trial court determined that the physical evidence and other testimony showed that the encounter did not occur in the manner Harris described and that Harris may have been motivated by anger or aggression rather than self-defense. And when considering the issue again after it was raised in Harris's motion for new trial, the trial court further explained that the evidence at the immunity hearing showed that there had been tension between Harris and Darius immediately preceding the shooting. Harris had recently lost his job and asked Darius to help with rent, but Darius did not have any money. Harris also claimed that Darius was drugging and sexually assaulting him, his child, and Daysha, yet Harris never asked Darius to move out of the home and never notified law enforcement. The evidence also

9

showed that there was no gun in the vicinity of Darius's body, but rather a gun was hidden underneath a cushion with no bullet in the chamber, and that Harris fled the scene and lied to officers about where he disposed of his gun.

On appeal, Harris claims that because he was the only witness who was present when the events transpired, the trial court erred when it did not credit his testimony and did not grant him immunity. However, other than Harris's self-serving testimony, there is no evidence that Harris acted in self-defense. Rather, as the trial court concluded, the evidence showed that Harris was upset with Darius for failing to help with rent. The forensic evidence showed that Darius was not holding a weapon at the time that Harris shot him multiple times, including in the top of the head and in the back, indicating that Darius was not confronting Harris when Harris fired several of the shots. Harris also fled the scene, disposed of the weapon, and later misled the police about the location of the gun, prompting officers to look in several locations without success.

Thus, the trial court's factual findings and credibility

determinations were supported by evidence presented at the immunity hearing, and the trial court was authorized to reject Harris's self-serving testimony and deny his motion for immunity from prosecution. See *Ellison v. State*, 313 Ga. 107, 111 (868 SE2d 189) (2022) (given the evidence presented, the trial court was authorized to reject the defendant's self-serving testimony and conclude he had not met his burden to prove justification); *Hornbuckle v. State*, 300 Ga. 750, 753 (2) (797 SE2d 113) (2017) (trial court was authorized to conclude defendant's actions were motivated by aggression or anger and to deny immunity from prosecution where the physical evidence and defendant's statements provided some evidence that the encounter did not occur in the manner she alleged). Accordingly, this enumeration of error fails.

2. Harris also asserts that the trial court plainly erred in admitting an in-life photograph of Darius. We are not persuaded.

At trial, the State called Tasheka Roberts, Darius's mother, to present a single in-life photograph of Darius. After Darius's mother confirmed that the photograph, which depicted Darius alone against

11

a neutral background, clearly and accurately reflected how Darius looked in the weeks before his death, the State asked to enter the photograph as an exhibit. Harris's counsel then stated, "No objection, Your Honor." In ruling on this issue in Harris's motion for new trial, the trial court determined that Harris's trial counsel affirmatively waived any objection to the admission of the photograph.

On appeal, Harris asserts that, despite his trial counsel's failure to object, the trial court committed plain error in admitting the photograph because it likely stoked the jury's emotions through the victim's mother. To prevail on this claim, Harris must satisfy all four prongs of the plain-error test:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error — discretion which

ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Williams v. State*, 315 Ga. 490, 495 (2) (883 SE2d 733) (2023) (citation omitted; emphasis in original).

Here, assuming without deciding that Harris did not affirmatively waive the claim of error through his counsel's statement that she had no objection to the admission of the in-life photograph, we conclude that any error did not affect Harris's substantial rights. Darius's mother's testimony was very brief, and the photograph was fairly benign, depicting Darius alone on a neutral background. Moreover, there is no indication that Darius's mother became emotional during her testimony, and the evidence against Harris was strong. Thus, Harris cannot show that the admission of Darius's in-life photograph probably affected the outcome below. See *Williams*, 315 Ga. at 496 (2) (we need not analyze all four prongs where an appellant fails to establish one of them); *Bozzie v. State*, 302 Ga. 704, 708 (2) (a) (808 SE2d 671) (2017) (no plain error because, given the strength of the evidence against

the defendant, he could not establish that the admission of a single in-life photograph of the victim with his wife and grandchildren probably affected the outcome below). Accordingly, Harris cannot show plain error, and this enumeration of error fails.

*Judgment affirmed. All the Justices concur.*