NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 3, 2026

S25A1023.  FLAKES v. THE STATE.
S25A1024. THE STATE v. WILLIAMS.

PINSON, Justice.

Jeffrey Flakes, Jr., and Curtis Williams, III, were convicted of malice murder and other crimes in connection with the shooting death of Stanford Duane Jones.[1] They each moved for a new trial.

---

[1] The shooting occurred on August 10, 2018. On November 13, 2020, a Muscogee County grand jury indicted Flakes and Williams each for malice murder, felony murder predicated on aggravated assault, and armed robbery. The two defendants were tried together from October 24 to 28, 2022, and the jury found them guilty of all charges.

Flakes was sentenced to life in prison with the possibility of parole for malice murder and the same sentence for armed robbery, to be served concurrently, while the felony murder count was vacated by operation of law. Flakes timely filed a motion for new trial, which he later amended through new counsel, and then amended a second time through a different new counsel. After an evidentiary hearing, the trial court denied Flakes's motion for new trial on January 28, 2025. Flakes filed a timely notice of appeal. The case was docketed to the August 2025 term of this Court and submitted for a decision on the briefs.

Williams was sentenced to life in prison without the possibility of parole for malice murder and the same sentence for armed robbery, to be served con-

Flakes's motion was denied, and he now appeals his convictions and sentences. Williams's motion was granted, and the State appeals from that order.

The State claims on appeal that the trial court erred by granting Williams's motion for a new trial on the ground that the prosecutor had represented Williams before as a public defender in an unrelated matter. In its order granting a new trial, the trial court concluded that it had abused its discretion by denying Williams's motion to disqualify the prosecutor when Williams first raised it, at the outset of trial. But relevant law supported the trial court's original decision not to disqualify the prosecutor. So that decision was not an abuse of the trial court's discretion, and the trial court therefore erred by finding that it was. The trial court's grant of a new trial on that ground is therefore reversed.

---

currently, while the felony murder count was vacated by operation of law. Williams timely filed a motion for new trial, which he later amended through new counsel. After an evidentiary hearing, the trial court granted Williams's motion for new trial on January 31, 2025. The State filed a timely notice of appeal. The case was docketed to the August 2025 term of this Court and submitted for a decision on the briefs. Williams's case has been consolidated on appeal with Flakes's case.

Flakes claims on appeal that the trial court erred by allowing a non-expert witness to identify him in a surveillance video; that the trial court abused its discretion by admitting evidence relating to an uncharged aggravated assault without applying the balancing test of Rule 403; that the trial court committed plain error by failing to disqualify the prosecutor, who had represented Flakes before in an unrelated matter; that the trial court committed plain error by allowing the State to present in-life photos of Jones through Jones's spouse and by allowing the State to introduce victim-impact testimony from Jones's spouse; and that trial counsel gave constitutionally ineffective assistance when he failed to object to the non-expert witness's identification of Flakes in the surveillance video and failed to move to disqualify the prosecutor.

Those claims of error fail. The witness's identification of Flakes in the surveillance video was unlikely to have affected the outcome of the trial because the other evidence of guilt was fairly strong and because the jury could see for itself what the video showed. Contrary to Flakes's argument, the trial court did apply the balancing test of

3

Rule 403 before admitting evidence of the prior shooting, and it did not abuse its discretion by admitting that evidence. Flakes waived his claim that the prosecutor should have been disqualified by failing to raise it at the earliest opportunity. The admission of in-life photos and victim-impact testimony was unlikely to have affected the outcome of trial, because the evidence of guilt was fairly strong. And counsel was not ineffective in the ways Flakes alleges: counsel's failure to object to the witness identifying Flakes in the video was unlikely to have affected the outcome of trial, and Flakes has not established that counsel rendered deficient performance by failing to move to disqualify the prosecutor, because it was far from clear at the time that such a motion would have succeeded. Flakes's convictions are therefore affirmed.

1. The evidence at trial showed the following. On the morning of August 10, 2018, Jones was found dead on the floor of his home. He had been shot in the head, chest, and forearm, and the home looked like it had been "ransacked." The friends who found him called 911.

Responding officers secured the crime scene. Jones had been shot four times, and one bullet had lodged in the wall. Police retrieved the bullet from the wall and collected three spent cartridge casings. Those casings were later matched to a gun that Flakes had used in an uncharged incident a month earlier (more on that below).

A few days after the shooting, Flakes was arrested and interviewed by police. The interview was video and audio recorded, and a portion of the interview was played for the jury. In that portion, Flakes said that he had lived with Jones for "[a] few months," but that he had recently moved out because Jones was "going in a direction with his life that [Flakes] didn't agree with."

Police got a search warrant for Flakes's cell phone records. The records showed that Flakes's phone and Williams's phone were in frequent communication on the night of the murder and the next day. Flakes's phone called Williams's phone at 9:53 p.m. on August 9, the evening before Jones was found dead. At 11:12 p.m., Williams's phone texted Flakes's phone: "Un-lock dat 3. No Cappin Str-8 Action { N.L.G }." Flakes's phone then called Williams's phone

three times between 12:02 a.m. and 12:05 a.m. At 2:45 a.m., Williams's phone called Flakes's phone. Finally, Williams's phone called Flakes's phone at 2:37 p.m. the next afternoon, at which point the phones connected for nearly six minutes. In all, Flakes's phone and Williams's phone connected 21 times between 2:22 p.m. on the afternoon before the night of the murder and 2:37 p.m. on the next afternoon.

Several months later, Williams was interviewed by detectives. The interview was video and audio recorded, and portions of the recording were played for the jury. In that portion, Williams admitted to being present when Jones was killed, but he denied that he killed Jones. He said that he was inside Jones's apartment to buy drugs and that he opened the door to let another person inside. When asked if he had a gun while inside Jones's apartment, Williams initially denied it, but then he said that he had a gun that belonged to Jones.

At trial, witnesses testified that Williams was seen in and around Jones's apartment complex on the night of the shooting. One

6

resident testified that he saw Williams twice that night: once shortly before the witness heard gunshots nearby, and then again after the gunshots. Before the gunshots, Williams was carrying an empty bag. When the resident saw Williams again after the gunshots, the bag was full, and Williams had "[w]hat appeared to be blood" on his clothes.

The State also introduced footage from security cameras that were positioned around Jones's home. As the footage was played, Lieutenant Anthony Locey described what was shown. The footage, which had no sound, showed a person arriving at Jones's front door at 12:09 a.m. on the night of the murder. The person left, then returned at 12:51 a.m., left again, and then returned a third time at 1:13 a.m. The last time, the person went into the home. A few minutes later, at 1:16 a.m., a second person appeared, walking with what Lieutenant Locey described as a "unique walk," which he said "could be somebody with a sore ankle or a sore knee" and "wasn't a smooth flow walk." That second person went to the door of the home. The first person answered the door, holding a gun, and greeted the

second person. The second person pulled a gun out of his waistband. Then both of them entered the home. Finally, at 1:23 a.m., the footage showed two cats looking at the door of the home, which, according to Lieutenant Locey, "[c]ould be indicative of something loud just happening inside there."

While Lieutenant Locey was still on the stand, the State revisited the "unique walk" of the second man in the security footage. To that end, the State played a video of Flakes walking that was recorded at the county jail. The State asked: "[I]s that the gait you're talking about walking back, sort of left and then right, and then left and then right?" Lieutenant Locey replied: "Correct."

## S25A1024

2. The State claims that the trial court erred in granting Williams a new trial because the prosecutor had a conflict of interest under Georgia Rule of Professional Conduct 1.9(a). The basis for that conflict was that the prosecutor, Robin King, had represented Williams before when King was a public defender, in a case in which Williams pleaded guilty to possession of a firearm by a convicted

8

felon. A trial court's ruling on a motion to disqualify a prosecutor is reviewed for abuse of discretion. See *Neuman v. State*, 311 Ga. 83, 88 (2021).[2] But when, as here, that review is conducted by a trial court on a motion for new trial, and the trial court grants a new trial, an appellate court reviews that grant of a new trial de novo. See *State v. Kelly*, 290 Ga. 29, 30-31 (2011) (first grant of a new trial "on special grounds involving a question of law" is reviewed de novo). See also *State v. Johnson*, 305 Ga. 237, 239 n.5 (2019) (reviewing de novo a trial court's grant of a new trial when the motion-for-new-trial court found error in the trial court's jury instructions).

(a) At the outset of trial, Williams, speaking on his own behalf, raised a concern about King having "a conflict of interest." Williams explained: "She used to be my public defender back in '13, but how can she be my DA now. It's a conflict of interest[.] …. I don't trust

---

[2] Some of us question whether abuse of discretion is the proper standard of review for a trial court's ruling on a motion to disqualify a prosecutor. But we have applied that standard in multiple cases, see, e.g., *Pittman v. State*, 318 Ga. 819, 825 (2024); *Lee v. State*, 318 Ga. 412, 419 (2024); *Neuman*, 311 Ga. at 88, and no party has asked us to reconsider that standard here. See *Sprayberry v. Morris*, 322 Ga. 481, 490 n.6 (2025) (declining to sua sponte reconsider precedent that had been called into question).

[King] because she used to be my public defender in '13. She knows my prior criminal history. So I do not feel safe with her as my ADA neither." Williams's trial counsel did not take part in this discussion — in fact, Williams told the court during the same colloquy that he was dissatisfied with counsel because counsel refused to file motions that Williams asked him to file and because counsel had been speaking with a detective that morning.

Responding to Williams's request to disqualify her, King said that "[n]othing in any conversation that is attorney/client privilege[d] will be used," and that the prior case was entirely separate from the current prosecution, with "[n]ot the same parties, not the same firearm, not the same witnesses, not the same location." King acknowledged that she planned to use Williams's conviction in the prior case to seek recidivist treatment if he were convicted in this case, but she noted that the fact of the prior conviction was a matter of public record and contended that it did not create a conflict. The trial court concluded that King did not have a conflict that would preclude her from prosecuting the case.

At sentencing, King introduced Williams's prior convictions for aggravated assault and possession of a firearm during the commission of a felony, both from 2002, possession of a firearm by a convicted felon, from 2014, and aggravated assault and possession of a firearm during the commission of a felony, from 2016. Williams — this time through counsel — then renewed his objection to King's prosecuting him because she had represented him as a public defender in the 2014 conviction. The court noted the objection and overruled it again.

In his motion for new trial, Williams, through new counsel, claimed that the trial court had abused its discretion in denying his motion to disqualify King. This time, the court agreed with Williams. The court reasoned that, under the relevant law, this case was substantially related to the prior case when King represented Williams, and that the court's original ruling to the contrary was an abuse of discretion. The court therefore granted Williams a new trial on that basis. The court did not reach Williams's remaining claims of error.

(b) As noted above, the motion-for-new-trial court concluded that King had to be disqualified from prosecuting Williams under Georgia Rule of Professional Conduct 1.9(a). That rule states that if a lawyer has represented a person in a matter, she "shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client," unless the former client gives informed written consent. Rule 1.9(a), Ga. Rules of Prof. Conduct (GRPC), contained in Bar Rule 4-102(d). There is no question here that the interests of King's current client in this matter, the State, were materially adverse to those of her former client, Williams, whom the State was now prosecuting. And there is no question that Williams did not give informed written consent to be prosecuted by King. So the only question left for the trial court was whether the current criminal case was "substantially related" to the former matter. When the trial court denied Williams's first motion to disqualify, it initially concluded that those matters were not substantially related. Then, at the motion-for-new-trial stage, the court concluded

that that earlier ruling was an abuse of discretion, because case law showed that disqualification was required. We now review that last ruling de novo. See *Kelly*, 290 Ga. at 30-31. To put it simply, the question now is whether the motion-for-new-trial court was right that the relevant law compelled the conclusion that the two matters were substantially related and, thus, that disqualification was required.

That relevant law is thin, and it mostly points towards a case-by-case assessment of the circumstances relevant to disqualification. Here is what we have: This Court has said that Rule 1.9(a) is meant to "protect former clients, avoid the appearance of any impropriety, and maintain public confidence in the integrity of our adversarial system." *Hodge v. URFA-Sexton, LP*, 295 Ga. 136, 139 (2014). See also *Registe v. State*, 287 Ga. 542, 548–49 (2010). And a comment to Rule 1.9 advises that matters are substantially related if they "involve the same transaction or legal dispute" or if there is "a substantial risk that confidential information as would normally have been obtained in the prior representation would materially advance the

13

client's position in the subsequent matter." GRPC Rule 1.9 cmt. 3. Our Court has not expressly addressed or applied the "substantially related" standard or this comment in a published decision, but Court of Appeals decisions applying Rule 1.9(a) have quoted that comment language approvingly. See, e.g., *Befekadu v. Addis Int'l. Money Transfer, LLC*, 332 Ga. App. 103, 106–07 (2015). Court of Appeals decisions have also held that matters are substantially related if sufficient "material and logical connections" exist between the two. Compare id. at 104–07 (attorney was not necessarily disqualified from representing a member of an LLC who was being sued by the LLC when the attorney had filed the articles of incorporation for the LLC); *Rescigno v. Vesali*, 306 Ga. App. 610, 612–13 (2010) (law firm was not disqualified from representing the defendant in a wrongful eviction case when the firm had previously represented the plaintiff in her defense of a legitimation and custody complaint brought by a different party); *Duvall v. Bledsoe*, 274 Ga. App. 256, 258–60 (2005) (law firm was not disqualified from representing the plaintiff in a medical malpractice action when one of its attorneys, while with a

different firm, had represented the defendant in his divorce), with *Shuttleworth v. Rankin-Shuttleworth of Ga., LLC*, 328 Ga. App. 593, 593, 595–96 (2014) (law firm was disqualified from representing a member of an LLC being sued by the LLC for conversion, fraud, defamation, and other claims when the firm had previously represented the LLC in litigation regarding the membership agreement, leases, employment matters, and contract disputes); *Humphrey v. State*, 244 Ga. App. 808, 811–12 (2000) (prosecutor was disqualified from prosecuting a defendant for driving under the influence when the prosecutor's civil law partner had represented the defendant before in his divorce proceedings, in which the defendant's drinking had been an issue, because "[k]nowledge of [the defendant's] actual drinking habits or his credibility with regard to them" could affect prosecutorial decisions and tactics). And other decisions seem to have undertaken a similar analysis without expressly referring to the "substantially related" standard. See, e.g., *Tyree v. State*, 262 Ga. 395, 397–98 (1992) (reversing murder conviction on change-of-venue grounds, but indicating that if the defendant on retrial were

to move to disqualify the prosecutor because the prosecutor had twice represented the defendant while in private practice — once on child-molestation charges and once in a civil case arising from a motorcycle accident — then "the motion should be granted"); *Ventura v. State*, 346 Ga. App. 309, 309–11 (2018) (prosecutor was not disqualified from prosecuting a defendant for child molestation when the prosecutor's husband had previously represented the defendant in an unrelated case involving terroristic threats). In general, we can draw from the above precedent that the standards for disqualification of counsel are not to be "mechanically applied," and whether matters are substantially related for purposes of applying Rule 1.9 depends on the "facts peculiar to each case." *Duvall*, 274 Ga. App. at 258 (quotation marks omitted). All of this is to say that the law on what makes one matter "the same or substantially related" to another tends to speak in general principles and to be applied on a case-by-case basis.

That being the nature of the relevant law, a court would not abuse its discretion by concluding that the State's prosecution of

16

Williams here was not substantially related to the earlier case in which King represented Williams.[3] Consider the facts. In the earlier case, Williams pleaded guilty to possessing a firearm as a convicted felon. Eight years later, he was tried alongside Flakes for shooting Jones to death. The two cases obviously did not "involve the same transaction or legal dispute." GRPC Rule 1.9 cmt. 3. Nor was there a compelling basis for concluding that any "confidential information" that King "would normally have … obtained" in the earlier representation would "materially advance" the State's position in the later prosecution. Both cases involved guns, but that is where the factual similarities end. There is no indication that the gun used to kill Jones was the same gun that Williams had in 2014, or that Jones or Flakes had anything to do with Williams possessing a firearm in 2014, or that Jones or Flakes was connected to Williams's underlying felony conviction that led to his felon-in-possession status in the

---

[3] We express no opinion on whether the law also supports the conclusion that the two cases *were* substantially related — or, to put it another way, whether the trial court would have had discretion to *grant* Williams's original motion to disqualify.

first place. To be sure, a court could speculate, as the motion-for-new-trial court did here, that King probably would have learned something in the earlier case about Williams's behavior with guns that she could use in this prosecution. But the court also could have reached the opposite conclusion. That is, the court could reasonably have concluded that an attorney would not "normally" learn much, if any, confidential or damaging information about her former client's use of guns in the present day that was relevant to the current prosecution when she represented the client eight years ago in connection with a gun-possession offense and he pleaded guilty. Compare *Humphrey*, 244 Ga. App. at 811–12 (reasoning that when an attorney represented a client in a divorce in which the client's wife claimed that he "drank excessively," the attorney would normally obtain confidential information about the client's drinking habits, which the attorney's law partner could use in prosecuting the client for an alleged driving-while-intoxicated offense that happened "at or about the same time" as the divorce proceedings). At bottom, these two cases were far enough apart in time and subject matter that any

18

finding that they were "substantially related" would necessarily involve some amount of inferences, probabilities, and guesswork. And we have cautioned that "[a] theoretical or speculative conflict will not impugn a conviction." *Lamb v. State*, 267 Ga. 41, 42 (1996).[4]

Given our conclusion above, it follows that the motion-for-new-trial court erred when it concluded that it *had* abused its discretion by determining at the outset of trial that the two cases were not substantially related. We therefore reverse the court's grant of a new trial on that basis. Because the court did not reach the remaining claims of error in Williams's motion for new trial, we remand the case for the court to address those claims.

S25A1023

3. In Flakes's first claim of error, he contends that Lieutenant Locey should not have been allowed to testify that Flakes's gait in the jail video matched the "unique walk" of the second man shown

---

[4] Our conclusion that King was not required to be disqualified should not be understood as an endorsement of the State's decision to have this case prosecuted by a lawyer who had previously represented not only Williams, but also Flakes, as discussed further below.

in the surveillance footage. Because Flakes did not object to Locey's testimony at trial, the admission of that testimony is reviewed only for plain error. See OCGA § 24-1-103(d) ("Nothing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court."); *Dees v. State*, 322 Ga. 498, 500 (2025). To establish plain error, an appellant must show that the trial court committed an error that (1) was not affirmatively waived, (2) was clear and obvious and not subject to reasonable dispute, (3) affected the appellant's substantial rights, which usually means showing that it affected the outcome of the trial, and (4) "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Floyd v. State*, 321 Ga. 717, 722 (2025) (quotation marks omitted).

Flakes has not established plain error because he has failed to show that Lieutenant Locey's testimony likely affected the outcome of trial. First, the other evidence against Flakes was fairly strong. He possessed the murder weapon a month before the shooting, he acknowledged having a disagreement with Jones, and he was in

close communication on the night of the shooting and the following day with Williams who, in turn, admitted to being present for the murder and was seen shortly afterward covered with what looked like blood. The strength of that other evidence made it less likely that Lieutenant Locey's testimony was a significant factor in the jury's decision to find Flakes guilty. See *Felton v. State*, 322 Ga. 530, 540 (2025) (no plain error in admitting out-of-court testimonial statements when evidence of guilt was strong); *Jennings v. State*, 318 Ga. 579, 588 (2024) (no plain error in admitting incriminating Facebook messages when other evidence of guilt was strong). And anyway, that testimony was of questionable independent value given that the jury could see the videos and decide for itself whether they showed that Flakes's gait matched that of the second man in the home surveillance footage. See *Lee v. State*, 322 Ga. 44, 59 (2025) (harmless error to allow a testifying officer to identify the defendant in a video when "the jury could see for itself that the person in the video was wearing clothing … very much like the clothing that was later described by the victims … and then found in [the defendant's]

home"); *Huff v. State*, 315 Ga. 558, 565 (2023) (no plain error in allowing testimony that defendant held a gun "gangster style" when the jury "viewed for itself the video recording of the entire incident" and evidence of guilt was strong). In short, considering all the evidence against Flakes and the context of Lieutenant Locey's testimony, it is not likely that the testimony affected the outcome of Flakes's trial. So this claim fails.

4. Flakes claims that the trial court erred in admitting evidence of a shooting that Flakes was involved with about a month before the murder — which connected Flakes to the murder weapon — without subjecting the evidence to the balancing test of OCGA § 24-4-403 (Rule 403). We review a trial court's evidentiary rulings for abuse of discretion. See *Sinkfield v. State*, 318 Ga. 531, 545 (2024).

(a) On the first morning of trial, the State moved to introduce evidence of a shooting that Flakes was involved with about a month before the murder. The court held a hearing outside the jury's presence. In a proffer, the State called a police sergeant who testified about a shooting that he responded to in July 2018. At the scene,

officers collected spent cartridge casings and talked to witnesses, who said that the victim had been involved in a dispute with Flakes. The victim declined to prosecute, and Flakes was not charged.

The State argued that evidence about the earlier shooting was intrinsic to the charged crime because the cartridge casings from the shooting matched the casings recovered at the scene of Jones's murder. The trial court agreed to admit the evidence as intrinsic. The court specified, however, that the evidence would be "subject to the balancing that we're required to do of probative value versus the potential for prejudice or perhaps being cumulative or some other problem that's spelled out in rule – I think it's 401."[5] The court did not explicitly rule on the balancing test at that point.

Later in the trial, the State presented the evidence to the jury. The State called Tre'shon Allen, who testified that he was involved in a dispute with Flakes in July 2018. Allen said he was in an apartment with his sister, the mother of his child, and Flakes. While Allen

---

[5] As explained below, the trial court misstated the number of the rule at this point, but it was clearly referring to Rule 403.

was in a bedroom, he heard gunshots.

The defense objected at that point and asked for a mistrial. Counsel argued that the July shooting had "no relation to this case at all" and that it amounted to an attack on Flakes's character. Counsel further argued that even if the evidence was intrinsic, "you also got Rule 403 and bringing in character evidence." The State responded that it had already argued the Rule 403 issue during the hearing that morning. The State then argued that "the relevance is important" because "[i]t's the same gun," and that, as to the earlier shooting, "[w]e're not suggesting [Flakes] was in the wrong" and "[n]o one got hurt." The trial court denied the mistrial motion.

Allen resumed his testimony. Allen said that when he came out of the bedroom after hearing gunshots, he saw Flakes holding a gun. When the police arrived, Allen told them he did not want to press charges.

The State then called the responding officer. The officer testified that he collected several spent .45-caliber cartridge casings from the scene. Those cartridge casings were later found to have been

24

fired from the same gun that ejected the cartridge casings recovered at the scene of Jones's murder.

In Flakes's motion for new trial, he raised the issue again. The trial court, in denying the motion, concluded that the July 2018 shooting "was clearly admissible under Rule 403." The court also noted that it had said during the hearing on the evidence that it would subject the evidence to the balancing test, which, the court concluded, "indicates that the Court understood its obligation to conduct the Rule 403 balancing test."

(b) Flakes now claims that the trial court abused its discretion by admitting evidence about the July shooting without subjecting it to the balancing test of Rule 403 — a test that, in Flakes's view, the evidence would not satisfy. Flakes does not challenge the trial court's threshold determination that the evidence about the prior shooting was relevant intrinsic evidence, and we express no opinion on that point.

Intrinsic evidence, like other evidence, is subject to Rule 403.

See *State v. Harris*, 316 Ga. 272, 278 (2023). Under that rule, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, of misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403. In that balancing test, evidence is not considered "unfairly" prejudicial merely because it is inculpatory. See *Wilson v. State*, 315 Ga. 728, 738 (2023). Rather, the danger of unfair prejudice arises when evidence "has the capacity to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged, or an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Id. at 738–39 (cleaned up) (quoting *Old Chief v. United States*, 519 US 172, 180 (1997)). Ultimately, the purpose of the rule is to "exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Henderson v. State*, 317 Ga. 66, 73 (2023) (quotation omitted).

Here, as an initial matter, the record does not support Flakes's

contention that the trial court failed to apply Rule 403. While the trial court never explicitly ruled that the probative value of the July shooting was not substantially outweighed by the danger of unfair prejudice, it is clear from the discussions around the evidence that the court applied that test. First, during the hearing, the court said that the evidence would be "subject to the balancing that we're required to do of probative value versus the potential for prejudice or perhaps being cumulative or some other problem that's spelled out in rule – I think it's 401." (The court misstated the number of the rule, but not its substance.) Then, when Flakes objected to the evidence at trial, both Flakes and the State made arguments about the evidence's relevance and probative value and the danger of unfair prejudice. The State urged that the "relevance was important" because it connected Flakes with the murder weapon, and that the danger of unfair prejudice was low because no one was hurt in the prior shooting, and there was no suggestion that Flakes was at fault. Flakes, for his part, argued that the prior shooting was prejudicial character evidence that did not satisfy Rule 403. And the trial court,

having heard those arguments, admitted the evidence. Under those circumstances, it is clear that the trial court implicitly ruled that the evidence satisfied Rule 403. And we have recognized that a trial court need not make express oral or written findings under Rule 403 if it is clear from the record — as it is here — that the court made those findings implicitly. See, e.g., *Albury v. State*, 314 Ga. 459, 461–62 (2022) (concluding that the trial court "implicitly conducted the proper analysis under Rule 403, even though it did not expressly reference that rule," where the transcript showed that the parties and the court discussed the rule's application to the evidence); *Johnson v. State*, 312 Ga. 481, 493–94 (2021) (seeing no abuse of discretion in the trial court's "implicit conclusion" that evidence satisfied Rule 403 when the trial court admitted the evidence as intrinsic without making an oral or written ruling on Rule 403).

The trial court did not abuse its discretion in admitting evidence of the prior shooting. Evidence that Flakes possessed the murder weapon a month before the shooting had significant probative value. See *Roberts v. State*, 315 Ga. 229, 238 (2022) ("evidence and

testimony placing the murder weapon in [the defendant's] hands just nine days before the murder had substantial probative value"). And the evidence was arguably prejudicial, but not unfairly so. The aspect of the evidence that was *most* detrimental to Flakes — the fact that he possessed the gun used to kill Jones — was squarely relevant to this case, so any prejudice from that fact was not unfair. See *Old Chief*, 519 US at 180; *Wilson*, 315 Ga. at 739–40. And the prior incident, a shooting in which no one was hurt or prosecuted, was not unfairly inflammatory. There was little danger of the jury finding Flakes guilty because he fired a gun in Allen's apartment, rather than based on the evidence in this trial. See *Willis v. State*, 315 Ga. 19, 28–29 (2022) (evidence of the defendant's "relatively mild" prior convictions, including possession of marijuana and ob-structing a law enforcement officer, was not likely to inflame the jury's passions when compared to the much more serious charged crime of murder). In other words, the evidence of the July shooting was not the "evidence of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect" that

Rule 403 contemplates excluding. See *Henderson*, 317 Ga. at 73. So the trial court did not abuse its discretion in admitting that evidence.

5. Flakes next claims that the trial court erred by failing to disqualify King from prosecuting him, although Flakes did not move to disqualify her at trial. Flakes points out that King represented him in his defense against a gun-possession charge when she was a public defender, and he argues that King therefore must be disqualified under multiple Rules of Professional Conduct and decisions of this Court. But Flakes has waived this claim for appellate review. If a defendant seeks to disqualify a prosecutor because of an alleged conflict of interest, he must raise the claim "promptly after the defendant learns of [the] potentially disqualifying matter." *Reed*, 314 Ga. at 545–46. Here, Flakes asserts, and the State does not dispute, that Flakes and his counsel knew of King's prior representation of Flakes by July 29, 2022 — roughly three months before the start of trial — through "court filings and pre-trial discussions related to the prosecution's notice in aggravation of punishment, notice of intent to seek

recidivist punishment, and notice of intent to use prior convictions for impeachment[.]" But Flakes did not move to disqualify King until his motion for new trial. That was well after he knew of the "potentially disqualifying matter," and so the claim is waived. See id. at 546.[6]

6. Flakes also contends that the trial court committed plain error by admitting two in-life photos of Jones that showed him with his family, rather than alone, and by allowing Jones's wife, Tekeymon Jones, to give victim-impact testimony. Tekeymon testified that Jones had an "unbreakable" bond with his oldest son, and that the couple also had a son with autism, with whom "no one else could talk" as Jones could. She also described how Jones would sometimes take their daughter to day care and read to the children there, and how he sometimes acted as a "teacher's aide" at his autistic son's school. She said that when Jones was killed, "the whole school was

---

[6] Flakes suggests that we can still review his disqualification claim for plain error, even though he did not raise it below. But as explained above, a claim that a prosecutor must be disqualified due to a conflict of interest is waived if it is not raised at the earliest opportunity. See *Reed*, 314 Ga. at 545–46. It is not subject to plain-error review.

just devastated."

Assuming that it was clear and obvious error to admit these photos and this testimony, see *Boyd v. State*, 284 Ga. 46, 48 (2008) ("As the sole purpose of introducing a photograph of the victim in life is to establish the victim's identity … every effort should be made to proffer a photograph of the victim alone."); *Lofton v. State*, 309 Ga. 349, 363 (2020) ("[E]vidence about a crime victim's personal characteristics and the emotional impact of the crime on the victim, the victim's family, and victim's community generally is not admissible in the guilt/innocence phase of a criminal trial."), Flakes has not shown that the error likely affected the outcome of his trial. First, as discussed above, the evidence of Flakes's guilt was fairly strong: evidence connected him to the murder weapon, he had a disagreement with Jones, he was in close communication with Williams, who placed himself at the scene, and he had an unusual gait that the jury could compare to that of one of the perpetrators in the surveillance video. And on the other hand, the in-life photos and Tekeymon's testimony were not especially inflammatory. There is

no indication that Tekeymon became emotional on the witness stand in a way that could evoke outsized sympathy. And the defense was able to counter Tekeymon's testimony about Jones's good character with evidence of another side of him: that he regularly sold drugs around the apartment complex. So the admission of the in-life photos and victim-impact testimony was not likely to have affected the outcome of Flakes's trial. See *Harris v. State*, 316 Ga. 141, 146 (2023) (admission of in-life photo through victim's mother did not affect outcome of trial when there was no indication the mother became emotional during her testimony and evidence of defendant's guilt was strong); *Nundra v. State*, 316 Ga. 1, 9–10 (2023) (admission of testimony about the victim's good character and the impact of his death on the community was harmless because evidence of the defendant's guilt was "very strong," and so "the risk that evidence of the victim's good character would lead the jury to convict [the defendant] for some reason other than guilt was fairly low"); *Lofton*, 309 Ga. at 356 (prejudicial effect of calling victim's mother to introduce in-life photo

was lessened by, among other things, the mother not showing "evidence of strong emotion"); *Bozzie v. State*, 302 Ga. 704, 708 (2017) (admission of in-life photo showing victim with his family "did not affect the outcome of the trial given the strength of the evidence" against the defendant); *Ragan v. State*, 299 Ga. 828, 833 (2016) (admission of five in-life photos showing victim with her family was harmless because evidence of defendant's guilt was strong and the jury was aware even without the photos that victim was a wife and mother). These claims of error therefore fail.

7. In his last claim of error, Flakes contends that his trial counsel gave ineffective assistance in two ways. To prevail on a claim on ineffective counsel, a defendant must show both that counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 US 668, 687 (1984); *Washington v. State*, 313 Ga. 771, 773 (2022). To show deficiency, the appellant must show that his lawyer performed "in an objectively unreasonable way," *Heyward v. State*, 319 Ga. 588, 592

34

(2024), taking into account "all the circumstances from counsel's perspective at the time of the challenged conduct, and in the light of prevailing professional norms," *Crouch v. State*, 305 Ga. 391, 400 (2019). That means the defendant must "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct." *McIver v. State*, 321 Ga. 565, 569 (2025) (quotation marks omitted). To overcome that presumption, the defendant must show that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Evans v. State*, 315 Ga. 607, 611 (2023) (quotation marks omitted).

To show prejudice, a defendant must show that, but for counsel's deficient performance, there was a "reasonable probability" that the result of the trial would have been different. *Heyward,* 319 Ga. at 592 (quotation marks omitted). We have explained that this showing is equivalent to the one a defendant must make to establish that his substantial rights were violated in a claim of plain error. See *Watkins v. State*, 320 Ga. 862, 875 n.11 (2025).

(a) Flakes claims that his counsel was ineffective for failing to object to Lieutenant Locey's testimony about Flakes's gait. But as we explained above in connection with Flakes's claim of plain error about the same issue, Locey's testimony was unlikely to have affected the outcome of trial given the fairly strong evidence of Flakes's guilt. That means that even assuming counsel performed deficiently by not objecting, Flakes was not prejudiced by that deficient performance. See *Watkins*, 320 Ga. at 875 n.11; *Heyward*, 319 Ga. at 592. So this claim fails.

(b) Flakes also claims that his counsel gave ineffective assistance by failing to move to disqualify King as a prosecutor at the earliest opportunity based on her earlier representation of Flakes defending against a firearm-possession charge. In Flakes's view, if counsel had moved to disqualify King at the earliest opportunity, and thus had not waived the conflict-of-interest claim, see *Reed*, 314 Ga. at 545–46, then the motion would have been granted. As discussed above, to avoid waiver here, counsel would have had to move to disqualify King on or soon after July 29, 2022, when he learned of

36

the potential conflict, so we understand Flakes to contend that his counsel should have made the motion at that time.[7]

This claim of ineffective assistance fails because Flakes has not met his burden to establish that his counsel performed deficiently. That burden is a difficult one to meet: Flakes must establish that no reasonable lawyer in Flakes's counsel's shoes would not have moved to disqualify King when he learned of the potential conflict, given the circumstances and the law existing at the time. Among other things, that means showing that the motion was so likely to succeed that no reasonable lawyer in Flakes's counsel's place would have thought otherwise. Cf. *Pugh v. State*, 318 Ga. 706, 720 (2024) (to determine whether trial counsel was deficient for failing to file a motion to suppress, "we ask whether a motion to suppress on the specific basis proposed by the appellant would clearly have succeeded had his trial counsel raised it" (quotation marks omitted)).

Flakes has not made that showing. First, as we explained

---

[7] Flakes does not argue that counsel was ineffective for failing to raise the disqualification claim at a later time, such as at the outset of trial or at the sentencing hearing.

above, our law concerning the disqualification of attorneys for conflicts of interest under Rule 1.9(a) is thin, and it speaks mostly in general principles. A court applying that law could conclude that there was no substantial risk that the kind of confidential information that King could have learned in defending either defendant against their firearm-possession charges could be used against them in this prosecution for a shooting death. See, e.g., *Rescigno*, 306 Ga. App. at 612–13 (identifying no "material and logical connection" between a previous legitimation/custody action and the current wrongful-eviction action, despite the eviction defendant's argument that "matters of parental fitness, living environment, and her financial situation [were] substantially related to the landlord/tenant issues involved in this case"). So it is hard to say that any reasonable lawyer would have concluded that Rule 1.9(a) required King to be disqualified in Flakes's prosecution.[8]

---

[8] Most of Flakes's arguments on appeal under Rule 1.9 pertain to subsection (a). But he also makes a passing reference to Rule 1.9(c), which provides that a lawyer who has formerly presented a client "shall not thereafter … use information relating to the representation to the disadvantage of the former

38

Flakes also argues on appeal that King had to be disqualified under Georgia Rule of Professional Conduct 1.7 or our decision in *Sealey v. State*, 277 Ga. 617 (2004). But just as with Rule 1.9(a), Flakes has not shown that those authorities made it clear that a motion to disqualify would have succeeded.

Take Rule 1.7 first. That rule prohibits a lawyer from continuing to represent a client if "there is a significant risk that … the lawyer's duties to another client, a former client, or a third person will materially and adversely affect the representation of the client[.]" GRPC Rule 1.7(a). Here, that would mean that King could not represent the State if that representation would be compromised by her duty to Flakes, her former client. But even assuming that Flakes would have standing to disqualify King on this basis, he has not shown that the rule would require disqualification in this case. That is, he does not explain how any of King's duties to him as a former

---

client." GRPC Rule 1.9(c)(1). But Flakes does not make any separate argument under that subsection or explain how it could require King to be disqualified. To the extent Flakes is asserting a separate claim that King should have been disqualified under Rule 1.9(c), that claim is deemed abandoned. See Supreme Court Rule 22.

client would have adversely affected her ability to prosecute him now. And the one decision he relies on in support, *Registe v. State*, involved a prosecutor who switched sides *in the same case* and joined the defense team — an obvious conflict of interest. See 287 Ga. at 547.

Then there is *Sealey v. State*. That decision held that an entire district attorney's office need not be disqualified from prosecuting a defendant when a single member of the office had previously represented the defendant in an unrelated case, because that member was screened from the prosecution. See *Sealey*, 277 Ga. at 619. But *Sealey* does not mean that a prosecutor *must* be screened from a case if she previously represented the defendant. Put another way, *Sealey* held that the screen was sufficient to avoid a conflict of interest, but not that it was necessary. And *Sealey* did not grapple with what might have happened sans screen: whether the single prosecutor's prior representation of the defendant on an unrelated matter would have required his disqualification. Nor did it interpret the term "substantially related." So *Sealey* does not mean that a motion

to disqualify King would certainly have succeeded, either.

One last point. It is true that the motion-for-new-trial court eventually determined that King should be disqualified, once Williams's motion-for-new-trial counsel made the arguments that persuaded the court — arguments that Flakes never made below and (notably) still does not make on appeal. But even if the trial court would have had the discretion to disqualify King in the first instance — a question we do not decide here — it also would have had discretion not to disqualify her, and it was far from clear three months before the start of trial that a motion to disqualify would have succeeded. Importantly, the effectiveness of counsel "is not judged by hindsight or result." *Evans v. State*, 322 Ga. 644, 650 (2025) (quotation marks omitted). At bottom, Flakes has not carried his burden of showing, under an objective standard, that any reasonable lawyer in his counsel's position three months before the start of trial would have moved to disqualify King. For that reason, this claim of error

fails. See *Evans*, 315 Ga. at 611–12.[9]

*Judgment affirmed in S25A1023. Judgment reversed and case remanded in S25A1024. All the Justices concur.*

---

[9] Flakes does not claim that the cumulative effect of any assumed deficient performance by counsel or errors by the trial court requires a new trial, and we do not see any merit to such a claim. See, e.g., *Williams v. State*, 318 Ga. 83, 97 (2024).